C. Venezuela S.A. & P.C. V.S.A. V.S.A. Ms. Sesson for the Appellate Ms. Carroll for the Appellate Good morning, Your Honors. May it please the Court, my name is Kate Sesson. I represent the defendants, the Republic of Venezuela and the Petroleos entities. We are here on remand in this FSIA appeal, and we are the appellants as to the expropriation claims brought by the parent company, which is H&P IBC. So as to those, I think there are two governing principles, perhaps, to start. One of them is the Supreme Court's instruction that a court may take jurisdiction over an expropriation claim only if it finds that the plaintiff has made out a legally valid claim, that there are certain rights at issue, namely rights and property, and that those rights were taken in a certain way, namely taken in violation of international law. That's what the Court said repeatedly throughout its decision. That's point one. Point two is everyone now agrees also that for H&P IBC, the parent, to state an expropriation claim, it has to show that its direct rights are at issue, not claims that its subsidiary could press. Those rights have to be independent of H&P Venezuela's claims. So as to those direct rights, H&P IBC now identifies two. The first is it claims it has a right, and I'm quoting here, to beneficial ownership and control in the assets of H&PV. That's its first direct right, and that's pages 27 to 29 of its first brief. The second direct right is that it has a right to the economically productive use of its shares in H&PV. The first right is not remediable under the SSIA because the assets of H&PV were not taken in violation of international law. The second right is not remediable under the Act because, as counsel for H&P conceded in the first rule of argument, its shares were not taken. So under either of those direct rights, H&P IBC has no expropriation claim. The question about expropriation as to H&PV falls under the domestic takings rule. And that rule, of course, the rule— Let's turn to the parent just for a second. So what do you say about the restatement? I know it's in the brief, but I want to talk a little bit more about the restatement second, and that would be section 192. I'm not contributable to a state that is intended to and does effectively decry an alien of substantially all of the benefits of its interest in property and constitutes a taking of the property. So that's section 192 of the second restatement, which of course is 1965, superseded by the third restatement. And to our knowledge, 192, since the third restatement issued, has never been cited by a court. In fact, the second restatement's provisions are cited these days only very rarely, included by this court in Simon, and largely for historical propositions. And what about the statements in the third restatement cited by your opponents saying that we didn't mean to make any changes between the second and the third? Well, I think the preface to the third restatement suggests otherwise. It suggests that there have been wholesale revisions to international law in between 1965 and the late 1980s. And of course, those revisions include, among other things, the Barcelona Traction case from 1970, and they were succeeded by, among other things, the Diallo case from 2007 and 2010, both of which came out of the International Court of Justice, and both of which I think bear on both parties' claims here. So with respect to the second restatement, we would suggest that there is very little left of it at all, and what is left of it appears only to be of historical significance, not current significance. Okay, and then with respect to Section 712 of the third, which was after Barcelona, comments to you? Yes. So with respect to Section 712, your Honor, I think made this point at the first argument. The black-letter law of Section 712 makes it very clear that when they talk in terms of a taking of an alien's property, you are talking about the taking of a property of a national of another state. So with respect to Comment G, all of the work that those comments do has to be read in light of that particular black-letter restatement provision. There is nothing inserted in one of these comments that is going to expand the principles of international law that are otherwise applicable here. There's nothing in Comment G that gives H&P IDC of a parent any greater right in its subsidiary than international law gives it, and it cannot claim as to its, for example, its productive use of shares, that it has any right that international law conveys to it. You'll notice in H&P IDC's brief, in its discussion, it relies very, very heavily on bilateral investment treaties, or BITs. The reason that H&P relies on the BITs is because those treaties give parent companies and shareholders different rights. I understand that argument. I'm just focusing a little more on G. So the alien clearly has a right in his shares, right? There's no doubt about that. The shares are the property of the alien. Yes. So the question is whether G, which says, other action that is confiscatory or that prevents unreasonably interferes on duly delays effective enjoyment of the alien's property. So if you totally eliminate the value of the shares by taking the underlying asset, why isn't that covered by G? But that is exactly what Barcelone Attraction and Diallo say. You cannot ascribe that interest to the shareholder. Diallo says that— So are you saying that Diallo is inconsistent with the third restatement? I'm saying that Diallo and Barcelone Attraction are both consistent with the third restatement to the extent that the third restatement speaks in terms of confiscation of the alien's property. It does not speak in terms of the confiscation of or the impact on an interest that a shareholder has in another's property. It talks about the effect of enjoyment of an alien's property. Yes, but again, that is exactly what Barcelone Attraction and Diallo talk about. So Diallo and the plaintiff in Barcelone Attraction both made out very strong cases for the fact that their enjoyment of their property or their shares has been completely undone by the actions of the defendant's state in those circumstances. And what both of them said is the impact on an interest is not enough. You have to show that there is a right effected. The United States said the same thing in its briefing here. You cannot show simply that there is an impact to an interest. You have to show that there was a right, and nothing in that restatement or in Condiment G gives H&P IDC, the parent, a right in the subsidiary's assets. So I was wondering whether the United States position is not quite completely there, and I can't tell whether it's intentional or not intentional, probably intentional. It says rights generally are not duplicated by state action that depreciates the value of a corporation's shares even severely. It doesn't say even totally. That would come completely to your position, right? You would have to say totally. No, I think, again, I would refer back to Diallo and Barcelona Attraction. Diallo and Barcelona Attraction both talk in terms of rendering an entity practically defunct, virtually bankrupt. Here, of course, you still have the entity, and that's the point that the Barcelona Attraction Court made. It's also the point that the U.S. has made in some of its other submissions, including Thunderbird and GAMI Investments. As long as that entity remains, that entity has a right, of course, to press its own claims. In fact, H&PV, which is here as a plaintiff, is continuing and has pressed its claims in arbitrations against other entities and has assets in the bank as a result of that. It is only when the entire company is taken, and each of you on the panel acknowledged at the last argument that the entire company has not been taken here, and Mr. Ogden, who was arguing for H&P at that time, acknowledged that the shares of the company were not taken. In your view, all the assets can be taken, though, is that right? The assets can be taken, and the company can still remain extant, yes. As long as it's not a corporate shell, it's sufficient. I don't mean shell in a derogatory way, just as long as the legal entity remains. Yes, that's exactly right, because the entity can still press its claims. Now, what the United States has said, not just in this brief but in other submissions, is this is what the U.S. has called a common situation without a remedy, where a shareholder in a company has the company's assets taken by a state, for example, that doesn't have a bilateral treaty with the shareholder state, and in those circumstances, there is no remedy available under international law for that shareholder. That's exactly why the bilateral investment treaties exist, and it's why NAFTA Section 1110 and 1117 exist, because those are the provisions that locate that kind of right, an indirect right that a shareholder in a company might otherwise have. That's not what Diallo says. Diallo says that there could be a remedy in a situation where there's a violation by the respondent state of their direct rights, that's appearance. Direct rights that are defined by the domestic law of that state. They said that would be a violation of international law. Yes, and I think that conforts Judge Tatel with one of the points that I led off with, which is that to the extent that H&P IDC is asserting its direct rights, those again, according to IDC's own description, fall into two categories. One of them is rights in H&PV's assets, but as to those... But what about the other, namely the residual rights to manage the corporation, which they claim are protected by the Commercial Code? No, I think the second right that they claim is that right to productive use and enjoyment of the shares, but that is exactly what Diallo says you can't press because that's not considered to be a direct claim. The right to productive use and enjoyment of shares is protected in many ways by many bits. It is not protected under international law, and that I think is the impediment to H&P IDC's second... The second direct right they were claiming was a direct right described in Barcelona Tract, namely the residual right of the parent to participate in the major activities, disillusion, sale, change of goals of the subsidiary. Yes, but those are rights, Judge Tatel, that are always associated with the ownership of the shares. That doesn't confer in H&P IDC, the parent corporation, any rights in H&PV's assets. That just is voting one of the packages rights that comes along with ownership of the shares, and again, everybody has conceded that the shares were not taken here. Was the company reduced in value, significantly reduced in value? It can't control, it can't use its shares, it can't exercise its right under its shares to influence the operation of the subsidiary now that it's completely under the control of the Venezuelan government. Judge Tatel, I think to the extent that H&P IDC is arguing that as a practical matter, it was able to control its subsidiary or influence its operations generally, of course, that's not something that's available to them to claim as a direct right either. And again, to the extent that they are arguing about how they can use their shares, they still hold their shares. They can still manage that property, which is their shares. The company has been reduced in value significantly. We acknowledge that. The problem is that there's no link between that reduction in value and what H&P IDC can claim as its direct right and property. The mere reduction of value, even to the point where the subsidiary is virtually bankrupt, practically defunct, only a shell. So then what are the direct rights of the shareholder that Marcelon Attraction was talking about? The direct rights of the shareholder have to do with, in part, what Your Honor was saying a minute ago, which is the right that the shareholder has to vote its shares, to receive dividends, to receive payments, to vote on the dissolution of assets. And, of course, the assets here, title, in fact, still remains in H&P V. The title still remains in H&P V. Explain to me once more, their argument is, yes, the company, the subsidiary still owns the assets, but the shareholders have been deprived of their direct rights as described by Marcelon Attraction. That's their argument. I still don't understand why. Because I think they are in error to say that they were deprived of their direct rights. There was no deprivation of theirs. That was the distinction that this Court recognized during the argument in 2015, that there is a difference. And this is the distinction, by the way, between this case and the Ninth Circuit decision in Siderman v. Blake. There is a difference between taking a company and taking its shares versus taking a company's assets, even all of the company's assets. And it is only when your shares have been impacted that your direct rights and property have been implicated. Because the shares concededly were not taken, the... In what case, what's the best case you have for that proposition? I think the best case is Marcelon Attraction itself. I think the only debate, perhaps, that we're having is... Well, but in Marcelon Attraction, the cause of action was on behalf of the subsidiary. The Court made it very clear that it was not considering an argument about the infringement of direct rights. That is correct, but then the Court in Diallo, both Diallos, 2007 and 2010, extended or used the baseline for that opinion in its own judgment, which was, of course, an individual bringing a claim against a state. In Diallo, there wasn't even an expropriation. The owner had simply been expelled from the company, and the Court didn't rule against him until it found, as a matter of fact, that he still could control the company. It was more difficult from abroad, but he could still control the company. So in neither of those cases do you have a situation like we have here. There was, in fact, I think, at least an expropriation in Diallo in the form of seizing a judgment to which Diallo said he otherwise was entitled. But you are correct. Diallo involved an expulsion of a person from the DRC, which Diallo maintained made it virtually impossible for him to run his company, and the ICGA said that that wasn't sufficient. I think that the bottom line here is that it's not just Diallo I or Diallo II or Marcelon Attraction or the distinction between Fideman and Blake. This is also the United States' consistent position that unless a shareholder can show that its shares have been impacted, have been seized or taken, then those direct rights are not viewed as having been impacted. That's what the U.S. said in this brief. That's what the U.S. said in the GAMI investment. What's the point of a rule like that? What's the point of a rule like that if the shares are worth nothing? What's the point of saying you take the shares, it's a violation, if you reduce the shares to zero, it's not? I think I would say that it has something to do with locating who holds the property and where the entity that is your subsidiary still exists, where the company hasn't been taken, where the shares haven't been taken. That entity, as here, can still press its own claims. Well, could it not be said that the point of it is to recognize what we've always understood to be the case with corporate law, that the corporation is an independent, created, artificial person and the property of the corporation is the property of that corporation, not of the individuals or other corporations that own the corporate shares? That's correct, and actually, Judge Chantel, Part 1 of your sentence is Article 201 of the Venezuelan Commercial Code, and Part 2 is Article 208. So those are the same principles that are in play here. If you look to Venezuela, the law is the source. And one more thing about source of law. The restatement, God bless it, no matter how respected it is, is not a source of law. It's mostly very learned and treated by a whole lot of people, but it's not a source of law. It is, by its title, a restatement, not a source of law. That's correct. So, I'm sorry, I have a different question. Okay, so there's a reference to this in your opponent's brief about corporation law requiring a shareholder in general, citing Fletcher, maybe citing Delaware law, that U.S. corporation law requires shareholder consent for the sale or transfer of all or substantially all of the subs of assets. So if that were Venezuelan corporate law, would that be a direct right? I think, again, the answer is no, and acknowledging that we are sort of interpolating from Fletcher to Venezuelan law to the question whether it's a direct right. I'm using it as hypothetical. Assume that on the list of, I take it you agree that the things in 280 are direct rights prefaced by the Department of Vote, right? Do you think, is Article 280 not a set of direct rights? Article 280 describes certain voting rights. That's right. But those rights, again, rest with the shares. They're not associated with the property itself. And for H&P IDC to make out a claim that it has direct rights in H&P V's property, it needs to show something different than that it has rights and it shares. So Article 280, I don't think, does any work in that regard at all. All Article 280 does is, in some respects at least, embody the Fletcher point, which is that a shareholder has certain voting rights when it comes to major aspects of the corporation, dissolution, merger, and so forth. But, again, to show that those rights have been impacted, you need to show that that property was taken, not just that the interest has been even severely affected. In Barcelona and Diallo, they talk about certain direct rights. Right? And one is the right to vote. Isn't that one? What's the other one that they have? Examples. They have the right to vote. I think they talk about dividends. Receive the dividends. Yes. The residuals after the dissolution. Yes. Right? Yes. Okay. So if they were actually deprived of their right to vote on transfer, assuming one of the items is transfer of all or substantially all the assets of the company, you're saying that being deprived of the right to vote somehow means not counting your vote or stopping you from going to the meeting or something like that, rather than effectively taking away your right to vote by just not paying attention to it. I think if I understand your question, the answer is yes. But I want to make sure that we're using Article 280, I think, maybe for two different purposes. H&P IDC invokes Article 280 as giving it a source of rights in H&P V's assets. No, I don't think so. Not in its assets. In its management. In its decision-making. Yes, but that is the productive use and control in H&P V's assets. That's how they frame that particular right. And that is not a direct right because H&P V's assets were not taken in violation of international law. So it doesn't matter where we look to find a direct right as to those assets. The separate question, then, is, Chief Judge Garland, your question about the rights in the shares. And I think the answer has to be yes. If you can still vote, even if the assets have been seized, if you can still vote your shares, you still have your shares. That property is still yours. They were not taken. So what I'm asking is, in the list of direct rights, which Barcelona gives as an example of direct rights, in the list of direct rights that the United States gives with respect to direct rights, is it not possible to conceive of, I'm not saying what Venezuela's are, I assume your position is it doesn't cover, but if one of the direct rights is a right to consent to the transfer of all or substantially all of the assets. Let's say that's the way it's written. Imagine this in Delaware. They adopt Delaware's code, and Delaware's corporate code says, shareholders have the right to consent to the transfer of all or substantially all the assets, which I think is the way these things generally work. And instead, the assets are transferred without their consent, which is what happened here. Is that a violation of direct rights? And if not, why not? I think, first, the assets were not transferred. They were expropriated. And that, I think, puts it into a different category altogether. There would never be a right to speak against expropriation unless it was your property. Correct. That's where we are on this whole claim. It was not their property which was expropriated. It was the corporation, not the property of the shareholders. That's correct. So the fact that the assets, again, were taken means that if HMPV had been a foreign national, it would have an expropriation claim because, as everyone, including the parent company here, conceived, those were its assets. So is the problem in my hypothetical use of the asset voice, like they were transferred, is your understanding then of that kind of corporate law, that the corporation can't transfer without the approval of the shareholders, but the corporation didn't do the transferring here. It was stolen, taken away from them, et cetera. Is that the difference? That's correct. Yes, that is the distinction because the corporation was not the one committing the act. But more to the point, you know, each of these examples and hypotheticals, in order to give HMPIDC a claim for taking in violation of international law, has to be shown to be a concept that is recognized in international law, not just through a bilateral investment treaty, not just through hypotheticals, but actually generally recognized and accepted and followed by the majority of states. I think what the United States position and also the International Court of Justice position is, if the domestic law of the country, Venezuela, gives a direct right and that direct right is taken, that's a violation of international law. Is that right? No, it's not. And that's why I began with the Supreme Court's recitation. Because, interestingly, when the government, in its brief, I think it's page 11, talks about that, that is the way the government phrases it. If you have a right and it's taken, you may have a claim. That is not the way the Supreme Court repeatedly phrased it in its decision. Pages 13, 16, 13, 19, 13, 24 of its ruling, every single time it says, you have to establish that the property, the relevant property, was taken in violation of international law. You ask two questions. Is there a right in property, a certain kind of right? Was it taken in violation, was the property taken in violation of international law? Yes, I take the point. I thought that the latter refers to all the elements of an international taking, an international law violation taking, namely, without compensation, et cetera, et cetera. But if you have property recognized by the state and it is taken, and then for that purpose you list the things that are listed in the statement, that's a taking in violation of international law, right? There are some kinds of property given in whichever right by domestic law which can be taken and not violate international law. If I understand your question, I think the answer is yes. We're not, I think, here debating, and I don't take HMP, IDC to be debating about what the nature of the property is. The only thing that we are debating is when it claims direct rights in either HMPV's assets or the rights that attach to its shares, were either those assets, HMPV's or HMP, IDC's shares, taken in violation of international law? The answer on the first one is no because of the domestic takings rule. The answer on the second one is no because the shares weren't taken.  It would, yes, but that's exactly what Mr. Ogden conceded in the first argument. And if they weren't able to vote, if the right to vote was taken away, in Diallo's case it was said he could still vote by appointing a proxy or something else, what if he were held incommunicado for the rest of his life and could not vote? Would that not be a violation? Not forgetting about the arrest part. If he was somehow physically precluded from casting a vote, maybe that would be a different case. But here the shareholders, the shareholder in this case, can still vote its share. The problem is that the assets that the company has have been substantially diluted, not extinguished by the way. As I said, it still has assets in the bank. What if Venezuela are the subsidiary from litigating? If Venezuela are the subsidiary from litigating? It's not a complete hypothetical. There's another case we've had which involved arbitration, which this country did bar the company from litigating. In fact, it said if you litigate, we will arrest you. I don't know that there is any provision made in either the ICJ cases, which I'm familiar, or by the United States in any of its submissions, that suggests that if a company still exists but somehow can't litigate itself, then those rights devolve onto the parent company. I thought you were saying that one of the reasons why their rights weren't taken here is that the company, even though it shall, can still assert its rights. I'm asking what happens if it can't assert its rights. That's not a reason why the shares weren't taken. It's a demonstration that the shares weren't taken. Because the subsidiary company is still here. So at that point, you really associate nothing with it, right? At that point, it doesn't matter to you whether they can or can't litigate. It doesn't matter. No, I think the only way I think I'm able to answer that hypothetical is with what I know as to this case, which is there is no principle of which I'm familiar that says that where the company's subsidiary still exists but is somehow barred from litigating that, at that point, all of its rights devolve onto the company. In fact, everything that we have in front of us here, I think, including the U.S.'s submission, talks about the direct rights of a company as being necessarily independent from those that the subsidiary can bring. That's both in H&P's own brief and in the government's brief, that those rights have to be independently sought. So our argument that they still have the ability to litigate actually doesn't matter, right, from your point of view. It doesn't matter what they do or they don't. No, I think the reason I mentioned it was simply to demonstrate that the company was still extant. The company is still extant whether or not it elected to litigate. Here, in fact, it is litigating, but it doesn't, again, supply the reason why the shares still exist. It explains that the shares still exist. Suppose instead of the facts of this case, the involuntary decision of the, suppose a subsidiary had completely on its own transferred the oil rigs to a third party in Venezuela without seeking the approval of the parent. Could the parent sue under Venezuelan law, the subsidiary? I think that touches much more closely on Judge Sentel's comment earlier, that when you have the circumstance where it is the subsidiary itself committing an action that goes against the shareholder's rights, the shareholder presumably has a claim against the subsidiary. But here, of course, it was not the subsidiary's choice for those assets to be taken. It was an expropriation decree. Well, whatever the reason, doesn't it mean that there are some residual rights in the parent if it can sue the subsidiary? There is no such thing, Judge Sentel. Some residual direct rights. Sorry? A direct right that the parent has in the corporation. So there are no residual rights. There is a direct right, but that right inheres in the shares, the ownership of the shares. And unless the shares have been taken, those direct rights are lost. Maybe they still have their shares. The parent still has the shares, but as you said, they could under Venezuelan law sue the subsidiary for transferring the assets. I'm assuming that they could sue the subsidiary for transferring assets, yes. But that is because it is exercising a right that it has under that shareholder agreement. It would have no implications for international law, certainly. And it doesn't have any bearing on whether these direct rights are held as to the shares because the shares were not expropriated. Just one last question. It goes beyond the record here, but what is the status of the eminent domain proceedings in Venezuela? They are still ongoing. Venezuela, as you know, is in dire, dire straits. So I don't think that the litigation is progressing, but it is still a pending case in Venezuela. If there are no further questions at this time. Thank you. Good morning and may it please the Court. My name is Catherine Carroll. I represent the Helmreich and Payne plaintiffs. I would like to try to address the claims of both plaintiffs, but I'll begin where the discussion has focused this morning on the claims of the U.S. parent and sole shareholder, which is H&P IDC. As to H&P IDC, the Court should again affirm the district court's decision because H&P IDC suffered a taking of its own rights and property in violation of international law. What part of it? Say that again. I'm sorry. I said that the Court should again affirm the district court's decision as to IDC because the U.S. parent suffered a taking of its own rights and property in violation of international law. Before the taking… What were its own rights and property that it suffered a taking of? A couple of categories, and I think Ms. Stetson understood our position accurately. And that it is, number one, undisputed that H&P IDC, as the 100% shareholder, has its shares in the subsidiary. But its shares were not taken, were they? We would submit that, as a matter of international law, even where the former… No, but as a matter of fact, were its shares taken? In the sense of stockholder certificates that somebody could hang on their wall, no, they weren't taken. Don't they still have the same share in the corporations, the Venezuelan corporations, that they had before? International law recognizes… Don't they still have the same share in the Venezuelan corporations? Your Honor, with respect, they do not. They own legal title formally to their shares. That's a way of saying they have the same share in the corporation they had before. Yes, they own their same shares, but international law… It may not be worth much, but lots of corporate shares are not worth much. Your Honor, international law makes crystal clear that even where an owner has not been deprived of nominal, formal, legal ownership of shares, when that property has been completely destroyed in value, and when the beneficial ownership and control of the investment has been entirely destroyed, that is a taking, and I'd like to point to… What is your best source of law? I have several, Your Honor. Whoa, whoa, whoa, wait a minute. There's a little lesson you need to learn. Excuse me? You listen before I ask the question, before we start talking. What is your best source for the clear statement, crystal clear statement, that the taking of the property of a subsidiary is a taking of the property of the corporate branch? You're telling me that's crystal clear in international law? Yes. I just want to be very clear about what we think the rule is in our… I want you to be very clear about what your source is for the statement that's very clear in international law. International law in the form of, and I would like to touch on, arbitral decisions, the investment treaties, which we will show actually reflect… Give me the best one. What's the best source for that being a crystal clear statement in international law? The restatement provisions that Chief Judge Garland relied on… Restatement is not a source of law. Restatement is a treatment. That is true. It restates well-understood international law. The next set of things that I would point to are international arbitral decisions. And I have a couple that I think are extremely helpful in analyzing this case. But before I discuss the facts of them… You're taking a long time getting to what they are. What is it? Give me a citation. The Tidewater case, the Pope and Talbot case, the United States' position in the ELSI arbitration, and the other bits that are cited in the brief, for example, the U.S. model bit, the U.S. Honduras bit, and a report that I'll get to from the UN Commission on Freedom of Development. But if I could walk through those, because I think it would help to illustrate why the principle that we rely on is so clearly established and is correctly restated in the restatement. First of all, the suggestion that the bilateral investment treaties somehow derogate from or supplement customary international law is demonstrably incorrect. And to see this, I would point your honors to a couple of the examples that are cited in the brief. First of all, the United States model bit from 2012, which both parties rely on, includes in Article VI the proposition that both direct and indirect expropriations are a violation of international law, where an indirect expropriation is understood as one equivalent to direct expropriation, even without transfer of title. Annex B to that model bit states that the parties confirm their shared understanding that Article VI, quote, the U.S. Honduras bit that the defendants cite in their brief. In the transmittal letter, when the State Department sent that draft bit to the Senate, the State Department letter explained that the provision prohibiting either direct or indirect expropriation by measures tantamount to expropriation, quote, incorporates into the treaty customary international law standard for expropriation, including direct and indirect. The United States took exactly that position in its submission to the tribunal in Elsie, which was a case where the United States was bringing a claim on behalf of the Spanish that owned an Italian subsidiary. And the United States' position there was, quote, direct or indirect taking reflects international law principle, the customary international law principle that a taking includes unreasonable interference with the use, enjoyment, or disposal of property. For example, the United States said it is recognized in international law that measures are a taking when property rights are rendered so useless that they must be deemed to have been expropriated, even though the state does not purport to have expropriated them and the legal title formally remains with the owner. Is the position you're advancing now consistent with the United States' filing in this case? It's completely consistent, Your Honor, because the United States recognizes that where there has been a taking of the direct rights, including a taking of the shares, that can be the basis of a claim in violation of international law. Do you have the United States brief before you there? I do. Page 24 at C. I'm sorry. Page 24 and follow me and tell me. Of the United States brief? The United States brief, yes. Page 24? I have their own brief in front of me. I'm sorry, counsel. I've got their own brief. Your Honor, for further... Too many briefs in this case. Pardon? Your Honor, I mentioned earlier the Tidewater and Covent Talbot international arbitral decisions, and to start with the Tidewater one, I think it's another good illustration, not only... Can we just go back? I think what Director Santel is referring to is page 13 of the amicus. Yeah, thank you. Right, that's where we think... We're still waiting for the correct page, but I think... Sorry about that. No, we agree with the United States statement of how the analysis of IDC's claim ought to proceed, and we would note there that the United States recognizes that when the shareholder has suffered a taking of its direct rights, that can be a claim under international law, including when the shares have been taken, and as these authorities demonstrated... I think the part that he's referring to are not implicated by state action that depreciates the value of corporation shares even severely. Exactly. That's correct. We agree that, and the international law sources that I'm relying on recognize, that where the value of property has been severely diminished, that does not amount to an expropriation. The principle that we are relying on is one where it is not a mere diminishment of value, but in fact a complete destruction of all economically viable uses. It's a candidate somewhat to the line that you asked me about. Is it the case that there is still litigation or arbitration, excuse me, ongoing between the Venezuelan corporation and Venezuelan entities? There were two eminent domain proceedings commenced in Venezuela by the databases in Venice. One of those proceedings has now lapsed, although they still haven't gotten the property back from it. The other proceeding has been solved at early stages for several years, and there's no, as we've alleged... It would have hardly any value, right? Pardon me? It would have hardly any value, the right to proceed in that measure of the Venezuelan corporation. We did not expect that it would, given the nature of the system down there, and that's why our only real recourse is going to be to come to the courts of the United States, which, again, relying on the international law principles, we ought to be able to do. The Tidewater arbitration that we rely on, I think, is very helpful, both because the facts of the case are so similar and because of the court, the tribunal there, again, making clear that the indirect expropriation standard we rely on and reflected in the treaty underlying that arbitration reflects a principle that is, quote, well accepted in international law, that expropriation should not involve... You're quoting from what? I'm sorry? You said quote, and I'm asking you, you're quoting from what? Quoting from paragraph 104 of the Tidewater decision in which a Venezuelan subsidiary of a foreign shareholder had been seized and expropriated by the Pegasus defendants, and the tribunal there recognized that there's an expropriation when measures deprive the investor of the use and benefit of his investment, even though he may retain nominal ownership of the respective rights. So one other source on this that I'd like to point to, and that is a recent report, I think from 2012, just a general report written by the United Nations Conference on Trade and Development. It's a 2012 report just on expropriations generally, and to the extent the court is looking for further confirmation of the fact that as a matter not just of treaties but customary international law, there is a taking not only when there's a direct expropriation of legal title, but even where formal legal title remains in the owner, where the value of that property has been completely destroyed and where the rights of control and management have been completely gutted, as we allege here, that is a taking under international law. And with respect to the H&P IDC, which is a U.S. national, that is clearly a taking in violation of international law because there was no provision for adequate prompt and effective compensation. That's why this court was correct in the prior appeal to find the analogy to the Ramirez decision especially persuasive. In Ramirez, the court found it bizarre, with the word that the en banc court used, bizarre, to posit that the seizure and destruction of a sole shareholder's entire investment was not an injury to the property of the shareholder. And this gets to the point of the shareholder's right in the corporate property itself. As a sole shareholder, 100% exclusive beneficial use and control of the property of the corporation. And this court recognized that shareholders may have rights in corporate property, including the rights of beneficial ownership and control, and that the corporate form of ownership does not deprive the sole beneficial owner of a property interest. This court was correct to find that persuasive analogy last time, and it remains persuasive here. And as we've demonstrated, it is consistent with international law. Ms. Carroll, could I ask you to address the role that the commercial code plays in this? Because I understand that your argument there is that that does provide the shareholder, the sole shareholder or parent, with a direct right, correct? That can be recognized under international law. That's correct. International law, as Barcelona Traction makes clear, looks to municipal law to determine the direct right. That's why in Diallo, the court went through what were the rights of the shareholder under Congolese law. Here, looking to Venezuelan law, we think a couple of sources are relevant. Although it's true that Venezuela recognizes the corporate form, Article 280 identifies certain rights of control, in particular a right of consent or veto over alienation of the assets, which is a core stick in the bundle of property rights, controlling or negating alienation of assets. It's clearly a property interest. What about Ms. Stetson's argument that that's not implicated here because they still own their shares? The parent still has its shares. That's the significance of the international law point, that there can be a taking even if you still have nominal legal ownership of shares. So here, there's no question— And that's supported by all the authorities you went through a few minutes ago? It is. The arbitral decisions that we cite, the bid practice that we cite, which again makes lucid that the principle is a principle of customary international law that is not simply an extra right conferred under the treaties. Ms. Stetson cited some submissions by the United States in a couple of cases. I think the Thunderbird case was one that she mentioned, in which the United States discusses certain provisions of NAFTA that we would agree do go beyond customary international law. But those provisions are very clear. They are speaking there about a derivative claim that is recognized under NAFTA. In contrast, those U.S. submissions recognize that the separate section of NAFTA, allowing a direct claim by the shareholder for a taking of its own rights, does reflect international law and is not a derogation of international law. So the U.S. position is very consistent through its submission in ELSI, through its submissions in the sources that Ms. Stetson has relied on, and in all of these bids, including the model bid, where the United States has repeatedly expressed the view that international law itself protects the investment of the shareholder, even though the shareholder's formal rights haven't been taken. Let me just ask you a follow-up question. So let's assume you're right that the Commercial Code does protect the parents' rights to basic management of the institution, and assume further that you're right that international law doesn't make any difference if the parent still has its shares. What's the argument that these are, quote, rights and property? Where does that come from? So this Court's prior opinion discussed that a little bit. If Your Honor will recall, the argument last time we were in this Court was that the phrase rights and property, as used in the FSIA, should be understood in a narrow way to refer only to sort of corporate ownership concepts. This Court, I think, correctly rejected that reading, recognizing that the phrase rights and property is broader, following the Supreme Court's analysis of similar language in the permanent mission case. That, in other words, that rights and property is a broad concept that can capture- Well, this is a question of Venezuela law. I'm sorry? Do we look to Venezuela law to see whether- Not last time, because the argument against- No, what about this time? This time, I think we would look at- Because we're not- the last case, we weren't talking about direct rights. This is different. We were talking about direct- HMTIDC's position all along has been that its own rights and property were key. Yeah, and its rights and assets. But what we're now talking about is Barcelona traction rights for the parent to be involved in major decisions regarding the disillusion or sale of the entity, not the individual oil drills. So I think the Court would look to Venezuelan law to understand what rights are conferred upon the sole shareholder. To determine whether those are rights and property within the meaning of the expropriation exception, and I think the Court would follow the same analysis that it did last time. One good analogy might be to this Court's decision in the Namariam case, for example, which was a suit against the Republic of Ethiopia involving Eritrean plaintiffs who had bank accounts in Ethiopia. And they'd been expelled, and they asserted a contractual right to payment of those funds upon demand. And this Court had to analyze, is that a right and property? And so the Court looked to Ethiopian law to understand what exactly is the nature of the right of these account holders, and then concluded under its own analysis of what rights and property means within the meaning of the expropriation exception, that the expropriation exception captures intangible rights, including what was, in that case, a contractual right to demand payment and receive payment upon demand. So it's a combination, really, of the Venezuelan law to understand what the rights are, and this Court's own analysis under the expropriation exception to understand whether those are the kinds of rights and properties that are protected from expropriation. Here, Your Honor referred to Barcelona Traction as the sort of nature of the rights that we're talking about. I think it needs to be very clear that in Barcelona Traction, there was no assertion of direct rights. In Diallo, the Court goes on to consider what those direct rights might have been, and I think it's a really useful contrast, frankly, because, as the Court noted earlier, Mr. Diallo, because he had been expelled, had a much harder time exercising control over his business. But the Court recognized that he could appoint a proxy, and that proxy could follow his instructions and thereafter control the company as he saw fit. This case is completely different. In this case, the allegation is that whereas HMPIDC once owned, controlled, and benefited from a successful business, the defendants have taken that entire business and all of its productive assets, and they now run it for themselves as a state-owned concern. And the result that we allege in the complaint is that HMPIDC's shares have been rendered completely worthless, and its control over the business and the assets of the subsidiary have been completely destroyed. International law recognizes that as an expropriation, notwithstanding that there may still be stock shares that we can hang up on our wall that haven't been taken. Tell me again what this distinction is. Is that a violation of taking of direct rights? Yes. And in what sense? Indirect taking of the shares? There's been an effective taking of the shares, and there's been, in exactly the way that this court understood last time we were here under Ramirez, a taking of the rights in the corporate property under Venezuelan law. Looking again to the suit under ______. So I'm not clear. I just don't exactly understand what Barcelona was saying when it said that even if the company was practically defunct, it's paralyzed, deprived of all of its sources of income, there wouldn't be a violation. So what are they saying there? What they're saying there, and this is where I believe the defendants are drawing this where they have to cease to exist as a company, what Barcelona Traction is addressing there are the circumstances under which shareholders may assert a derivative claim, stepping into the shoes of the company to assert an injury to the company. So the opinion kind of walks through a few different steps. It says, first of all, shareholders can bring claims for injury to their direct rights but not injury to the company. We don't have a claim of direct rights here, so we say nothing further about it. That's at paragraph 49. The court then goes on to consider, you know, there might be some exceptions to when a shareholder can step into the shoes of the company and bring essentially a derivative claim on behalf of the company for an injury to the company. And in that discussion, the court explains that that would be permissible when the company has ceased to exist or it is under some legal incapacity that prevents it from being able to assert its own interest. That might answer Your Honor's question from earlier. But that's what the court is getting at there is what are the circumstances when shareholders who've suffered no direct injury can proceed to bring a claim on behalf of the company itself. That's not the situation that we're in here. So then in Diallo 2, they do address Diallo's direct interests. And yet in 158, they again basically say the same thing. That is, they incorporate what they said in Barcelona. It considers there's no need to determine the extent of the business activities as the court has already found a precarious financial situation cannot be equated, blah, blah, blah. That sounds like they're now saying that even as to a direct right, the total process, et cetera, of the company. Except that Mr. Diallo's claim there was simply that I think the way it's phrased in the opinion is that his profits have been reduced. There has been a reduction in the volume of business or in the size of the profits. That's clearly not sufficient to amount to a direct expropriation under the line of authority that I adverted to earlier. And that's why that doesn't get you over that bar. If he wanted to assert that as a derivative claim, he would have to show the demise of the company for the language that Your Honor just read. And if he wants to bring it as a direct claim, he would have to show the complete destruction of all value and control, which he had not managed to show. But they say, they quote the part of Barcelona that says cannot be equated with the demise of the corporate entity. Not even the possibility of it being practically the quote. If Your Honor looked a little bit earlier, just prior to that discussion, there's a description of the argument that they're answering there, which is he puts out a claim that because of the special nature of the relationship of him and his company, on the facts of those cases there should be understood to be a merger between his own rights and the rights of the company, in light of the fact that there had been a reduction in the value of the profits. And so to the extent that that... So this is just a pleading problem he should have added in as one of his direct... I don't know if he would have been able to sustain that claim, because I don't know if it would be true that he had, in fact, lost all of the value of his investment that we've alleged here. The facts actually in the case suggest that maybe he hadn't, since all he would have to do is appoint a proxy and the business could continue. Again, the UN Commission on Trade and Development report, which I adverted to earlier, which is a 2012 report, kind of nicely encapsulates all of these principles together, and it makes clear that they apply with respect to a foreign shareholder bringing a claim for a taking of its own direct investment, even when you're talking about a domestic company. So I think that largely answers the question with respect to H&P IDC and the fact that it can proceed even when there's not been a formal taking of its shares. I think some of the legislative history leading up to the FSIA indicates that Congress would have readily understood this point as well. A couple of the sources that we cite, the 1972 State Department report on nationalization, goes through a long litany of worrisome expropriations that are largely directed at American interests, and many of them are examples where there's U.S. national owning interests in expropriated businesses, similarly with the House Committee report, which explains that specifically references indirect measures having the effect of expropriation, discusses the Cuban laws as an example, and explains that investments involving an element of proprietorship or permitting the investor to control or influence the business operation are the type of investor rights that are specifically the worry that is being aimed at in the run-up to the drafting of the expropriation exception. Can I go over to Mr. Diallo just one more second? I am a little confused by it. Paragraph 149 says, Any claims that Mr. Diallo no longer enjoying control over effective use of his rights as associate, which I take it to mean his rights as a shareholder, has suffered the indirect appropriation of his part socialis, that's part, I don't understand, is that what you're talking about, in the two companies, because his property rights have been interfered with to such an extent that he has been lastingly deprived of effective control over actual use of or the value of those rights. It's paragraph 149. Right, but so if you go on to paragraph 150, it explains that his argument is that the investment of the companies is, quote, falling in value, that there were actions that, quote, resulted in reducing the value, and so that's why we think this is not quite the same argument there that we're advancing here. In any event, I mean, I think that... Well, hard to tell. It's certainly not so clearly the other direction that it could stand up against what we've pointed to in the bid practice, the position of the United States in, for example, the LC case and the other arbitral submissions and the decisions of the arbitral tribunals. Again, I think I mentioned the Tidewater case earlier. Another helpful one, I think, is the Pope and Talbot case, which is a NAFTA case, but with respect to the direct rights issue, it again recognizes that this concept of expropriation based on the entire value, even when you still retain ownership of shares, is a principle of customary international law that has been incorporated into bid practice precisely because states generally and consistently recognize that that is the nature of protection that's entitled to foreign investment, and Venezuela recognized it as well in its decrees governing the rights of international investment, where it noted in Decree 356 and Decree 1867, which implements 356, that the assets themselves are defined to be the investment, and the foreign investor, if they are a 100% sole shareholder, is deemed to be the owner. In fact, it couldn't say it more clearly. 1867 states that the investment, that is the assets, is the property of the foreign investor in a 100% sole shareholder situation. So Venezuelan law recognizes the exact same principle in terms of the ownership interest of the sole shareholder in the corporate property and the value of its investment, exactly as this court recognized last time we were here drawing from the Ramirez decision. I'm sorry, could you say that again? What provision of Venezuelan law? Yes, so these are the Venezuelan decrees that are appended to our principle brief. So Decree 356 is the investment promotion and protection law. This is the law that the Chavez regime issued to suggest that if you come and invest in Venezuela, we will accord your investment the protections of international law. And the Article 3 of Decree 356, which is at page 17 of the addendum to our brief, gives the definition of investment, which is, again, very broadly defined, to include any asset to be used in producing income. It then goes on in the next paragraph to describe an international investment as being an investment belonging to or actually controlled by foreign individuals or corporations. It then goes on on the next page in the full additional paragraph to explain that there should be regulations to stipulate the conditions under which it will be deemed that an investment is owned or actually controlled by a foreign individual or corporation. Those regulations that they refer to there are Decree 1867, which is the next decree we append, starting at page 23 of the addendum. And in that section, under Article 3, the decree provides that for purposes of Article 3 of the earlier decree, that's 356, it's a little hard to see how these all pair up, but they do map on, it is understood that an investment is the property of foreign investors when their ownership interest in the company receiving the investment, that's the domestic subsidiary, is 100% of the capital stock, equity, or assets. So here in this situation, particularly under Venezuelan laws recognizing international investment, even apart from the rights granted to ordinary shareholders under Commercial Code 280, this is additional recognition under Venezuelan law that a 100% sole shareholder governed by this decree is considered to be the owner not only of the business but of the assets. And Venezuelan law went on to say if that's your position, then in fact your investment is entitled, as a matter of Venezuelan law, to the protections of international law, to fair and equitable treatment, and to protection against expropriation without adequate compensation and expropriation on discriminatory grounds. Of course, we do have an uncompensated expropriation here, both the taking of the rights and property of the U.S. parent, as well as the taking of the assets from H&TV, the subsidiary. We've gone way over time. I don't know if the Court would indulge a couple of comments on the H&TV issue. Yes. Unless there are questions. Let me ask a question still about the first. What degree of deference do we owe to Venezuela? I know this is an issue in the Supreme Court right now. What degree of deference, though, do you think we owe to Venezuela's view of its own law, and what degree of deference do we owe to the United States' view of international law? Sure. So starting with the Venezuelan point, we think in the circumstances of this case, while the Court would obviously afford appropriate consideration, we don't think they're entitled to any special degree of deference for a couple of reasons. Number one, because they are a party in the case. The case before the Supreme Court is a situation where the sovereign comes in as an amicus, without a dog in the hunt, so to speak. And so we think the circumstances here call for a little bit of additional scrutiny, particularly where the explanation is not persuasively supported or appears to be contradicted by the text of the legal authorities that we rely on. So this Court in McKesson, for instance, on questions of Iranian law, declined to defer to the position advanced by the sovereign in that case, and we think the same approach would be appropriate here, given the contrast between the documents of Venezuelan law and the position that Venezuela has taken in its brief, which is obviously a litigating position. With respect, just one footnote on that point, though, on the question of Venezuelan law, we would note that its relevance is limited to determining the nature of the U.S. parent's direct rights in the asset. It does not bear on the question whether there was a taking of H&P IDC's ownership of the business in the form of its shares. It's undisputed that H&P IDC owned that business and had shares in it, and it is a matter of international law that that was indirectly and effectively expropriated, notwithstanding that they still own the shares. So Venezuelan law doesn't bear on that. That, too, I take it, is a direct interest. Exactly. All of it is a direct interest, correct. Okay. And the United States? On the United States' position, I mean, obviously with respect to H&P IDC, they haven't taken a view one way or the other on the outcome. Not on the outcome, and I'm not sure whether we defer to outcome questions or not, but on their statement of the law again, to go over this again, they say that we only look at the direct rights, and they say, well, the shareholders' direct rights are not implicated, generally are not implicated by state action that depreciates the value of a corporation's shares even severely. What about that? I don't take issue with that statement. We agree that the shareholder should have a claim for an injury to its direct rights. That's what we've asserted here. That's what we've been asserting from the filing of our complaint through today. So that part is correct, whether to vote or not. On the specific point about the diminution in value of shares, again, we agree that a claim for even significantly reduced value …  Even severe is not a claim. What has to be alleged, and what we do allege, is the complete destruction of all economically viable and productive use, similar to the line that U.S. law draws between a permissible regulation that happens to affect the value of property, even significantly, versus an action that effectively takes the property, that renders property so useless that it must be de-medicated. That would be the difference that eliminates the value of the corporation's shares rather than depreciates the value severely? Right. So when the United States recognizes that there could be a claim if the shares have been taken, and you marry that up with the United States' recognition in the other sources, in its bids and in its article submissions, including in ELSI, that shares are taken when their value is completely destroyed and when the shareholders' rights of control and beneficial enjoyment of property have been completely destroyed. That's what's happened here. The United States would view that, at least according to all of its other positions, as a taking of the shares. And so we think that fits comfortably within the analysis that the United States has laid out in its immediate first share. Even if it may be worth very little, there is nonetheless the right remaining in the Venezuelan corporation to arbitrate in the proceeding, which, as you say, has been going on for years. Is that not the case? It may not be worth much, but they've still got that right, don't they? HMCD is the defendant in those proceedings. It's an imminent domain type proceeding in which they have the potential for winding up with something, theoretically at least, right? Our allegation is that theoretically there is no such prospect. No, theoretically there is such a prospect. That's not the allegation of the case, Your Honor. Okay. And the circumstances, I think, seven, eight years after the fact, now I think I can figure that out. So if this were the issue, that would be a fact that you've alleged, essentially zero value, but if it turns out that on remand facts are developed that it's worth something, that would be a different issue? I'm sorry, could you repeat the question? Your allegation is that it's worth nothing. But if that's only an allegation, sufficient for purposes of this proceeding, but that would indicate a remand for continued factual development on that question. And if it turned out that it was only severely depreciated, then you would agree with the United States that it's not a violation of that? With respect to the taking of the shares, there would still be the right in the corporate property as defined by Venezuelan law, which itself, as the court previously recognized under Ramirez, is also a right and property of the shareholder that can be expropriated by state action that completely takes away all right to control the property and all right to sort of beneficial enjoyment of the property. So that piece of it, we would say, would still go forward. But certainly, if the descendants wanted to defend on the grounds that actually HMPIDC still has some productive property in Venezuela, that might be an available defense. I'm pretty confident that they would not be able to make that demonstration, given how completely and totally, from the drilling rigs to the repair equipment to the real property down to the stationary and the trucks, all of it has been taken and the Pita Besa logo painted over ours. So I think there's not a prospect that that defense would actually be available. Again, it wouldn't eliminate the defense. It's not only the drilling rigs that have been taken. The land has been taken as well? So what happened here, the drilling rigs are on property. What happened is that Pita Besa descendants, accompanied by soldiers from the National Guard, came onto the property, barricaded it, seized it, and seized absolutely everything, the rigs, property, both movable and immovable property in terms of repair equipment, barracks. What about that reclaimed repair skill being some millions of dollars in the bank account? That is asserted in citing a 10-K form that was filed several years ago. I can tell you it does not reflect the current position by any stretch, but that form also indicates… Did it indicate the position when the suit was filed? I'm sorry? Did it indicate the position when the suit was filed? I think it indicated that there was some tied-up cash on hand, but the question is really what beneficial or productive use can be made of the property. And so the forms that they cite show no income, no potential for income, and although the assets were expropriated, the debts were not. And Your Honor can see the deflation that occurred between the 2012 form and the 2013 form and extrapolate from there. Well, the deflation is not the consequence of the expropriation. I'm sorry, I mean the depletion of the… Was there money in the bank at the time of the filing of the lawsuit? Yes. Thank you. I just want to clarify to make sure I understand this point. Even if there is remaining value in the assets, let's assume there are, does that have any effect on your argument about the direct rights under Barcelona traction? That is, your argument that they've taken the rights to govern the corporation, to attend general meetings. I was looking at Barcelona, sharing the residual assets of the company. Are those separate arguments? We've advanced two forms or two theories of rights and property that have been taken from the U.S. Tarrant that are both direct rights. One of those theories is a theory that undisputedly HMPIDC has a right and property in its ownership of the subsidiary. The issue there is the defendants say that wasn't taken because you still own your shares. We've pointed out that it's an international law question, and under customary international law, it is crystal clear that that can be taken even though we still legally own title to the shares. The second theory is the theory of a right in the corporate property, a right in the assets of HMPV itself. Barcelona traction tells us that's not a voting right of the type that Barcelona traction was referring to. It tells us to look to the municipal law under Venezuelan law to understand what right Venezuela accorded to the sole shareholder of a foreign investment. We've noted in the decrees and in the commercial code that Venezuelan law recognizes those rights of ownership and control by the sole shareholder exactly analogous to the rights of ownership and control that were present in the Ramirez case, which this court found especially persuasive here because of the fact- Is there any international law case, any example of a case and or any statement in a bid or otherwise that taking that right, specific one you're talking about, would be a violation of international law? I think the Tidewater case is a good example, and I'll concede that these two theories are really kind of hand-in-hand when you're talking about a sole shareholder situation. And so the Tidewater case was the one where a Venezuelan subsidiary that were in the marine transport business on the Gulf and the PDVSA descendants came in and seized specifically the vessels with what was taken. They're the property of the Venezuelan subsidiary. The parent, the ultimate Tidewater parent was a U.S. company, but they had an intermediate subsidiary in Barbados that owned the Venezuelan company, which is why they could proceed under the Barbados-Venezuela bid. But as the opinion in the case explains, the bid simply incorporated principles well accepted in international law. So the court goes on to recognize that where there's been a complete taking of the whole business, I think the language they use is all the infrastructure of the business has been completely taken. There's been an expropriation of the whole investment, the whole business, that that is unquestionably a taking under the same principles that we're relying on here. And it kind of meshes together both of these concepts of the shares and the risk. So it wasn't a case that the investment was effectively zero. We have a separate argument or are they really tied together? I think in the case of a sole shareholder, they naturally dovetail because part of the value of the shareholder's investment in the business is, as the court recognized the last time, the exclusive beneficial enjoyment of the corporate property and control over that property, the ability to influence that property. And so what's alleged here, for example, is that H&P, IBC, in fact, reviewed and had to approve the major strategic decisions of the subsidiary. So things like whether we move a drilling rig around within Venezuela or out of the country completely, those were decisions that H&P, IBC made. And it's precisely those facts that this court sitting on Bonn had in front of it in Ramirez, where the court again rejected out of hand the idea that simply because you have a corporate form of ownership, that that meant that the sole shareholder and sole controller of the property somehow didn't have any interest in property at all when the entire business had been expropriated. And that's exactly what we've alleged here. Further questions from the panel? No. Thank you. We'll give you two more minutes, Ms. Stetson, plus questions from the bench. I'd like to untangle three things and then make a couple points on them. Before you do all those, could I just ask two questions? So she referred to a number of documents, two of which I've been able to find easily. One is the statement in ELSI, the United States position, that the protocol for the treaty expressly extends the guarantee of compensation to interests held directly or indirectly by nationals. In other words, the treaty unambiguously protects investment interests in the United States. The taking of property, to which the treaty refers, encompasses a multitude of activities having the effect of infringing property rights under international law. A taking generally is recognized including not merely outright expropriation, but also unreasonable interference with its use, enjoyment, or disposal. And then the statement in... I'm sorry, I think it's the NAFTA. Which I've now lost all the quality. An annex deed in the NAFTA treaty. Article VI, expropriations, is intended to reflect customary international law concerning the obligation of states with respect to expropriation. The second situation is indirect expropriation where an action or series of actions has an effect equivalent to direct expropriation without formal transfer of title or outright seizure.  I appreciate your earlier point, which has to do with treaties or bids or arbitrations or whatever. But in these, the United States is saying that this is a violation of international law, that this is a principle of international law. And in neither of those was the United States saying that the customary international law rule on shareholder standing was somehow extinguished. The United States, as to NAFTA, said in the GAMI investments submission that we cite, paragraph 14... Before you get to those, what about this? Maybe there's inconsistency in United States positions. Each of those, I think, Your Honor, goes to something other than this principle of shareholder standing that I think the H&P IDC keeps trying to import into this discussion. There is nothing in either NAFTA or these bids when they talk about customary international law that suggests that a shareholder can have standing to press claims for damage or taking done to somebody else's property. I take it that the argument is to the shareholder's property, namely its shares, that you can take a person's shares not just by formally taking the document, but also by driving this value to zero. I do not take any of that to be a derogation from what we maintain customary international law is. For this reason, one of the other sites that we mentioned in our brief that I think H&P relies on is the CMS gas transmission case. That has to do with bids. It explained that bids permit shareholder claims. And it even said that such claims can now be considered the general rule. But it explicitly noted that customary international law may follow a different approach. There's nothing in these bids that suggests that customary international law as to the ability of a shareholder to maintain a claim going to somebody else's property is somehow vitiated. In fact, as the Diallo Court put it in its first decision, I think, the fact that these bids exist is just as equally evidence that that customary rule of international law does not exist. The U.S. in the Gambia Investments, if I could just continue on that NAFTA point I was making, notes at paragraph 14, it is well recognized that an important principle of international law should not be held to have been passively dispensed with by an international agreement. Nothing in the text of this NAFTA article suggests an attempt to derogate from customary international law restrictions on the assertion of claims on behalf of shareholders. And I would note, too, that when Ms. Carroll began her argument, and she was asked what the best authority was for the principle that IDC had a claim here, this is what she started with. She started with the bids and she started with the treaties. But, of course, that argument in the briefing was found in footnotes, three different footnotes, suggesting that these bids and these treaties had somehow aggregated over time into customary international law. That is simply not the case. I'm not focusing on that at all. I totally understand that point. What I'm asking is the U.S.'s representation in those documents about what customary international law is, that some level of deference is owed to. That's what I'm asking about. I think if we are to give deference to the U.S.'s interpretation in those documents, you would have to give equal deference to the U.S.'s interpretations in the other documents that I mentioned, which specifically say that nothing in these bids and treaties or NAFTA is designed to derogate from the rule that a shareholder can't press a claim on behalf of a company. Where is that one, that last statement? That was the GAMI Investments submission, paragraph 14. And it specifically speaks to shareholder standing. The other thing that you'll notice is that there's no reference, even in these submissions that H&P IDC is suggesting you interpret, there's no reference to shareholder standing. It's just a question of a different type of expropriation. The shareholder standing rule is and remains the same, and it's the same rule that Judge Santel articulated in the first go-around in this case, which is that a parent can't bring claims on behalf of the corporation. But that's, I hear your point about that, but isn't that with respect to shareholder standing with respect to the assets held by the subsidiary? One is, as Carol made clear, they're making two different arguments here. And the second one is it interferes with the parent's direct rights. Yes. Aren't those different? And that is, the answer is yes, and that is what I wanted to untangle. Yeah. So the court, I think, needs to resolve three questions. First, can H&P Z press an expropriation claim? Second, does H&P IDC have a direct right in ownership or control of H&P V's assets? That's the way that IDC puts it, ownership and control of H&P's or in H&P V's assets. Third is, does H&P IDC claim a legally valid direct right in its productive use of its shares? As to that first one, we have not had discussion on it, but the domestic takings rule bars H&P V's claim. As to the second, the domestic takings rule also controls, because to the extent that IDC is arguing that it has direct rights in H&P V's assets, which is exactly how they phrase it at pages 28, 29, 27 of their brief, those assets were not taken in violation of international law. So all of the Venezuela sites, Decree 356, Decree 1867, all of the articles, all of that is a relevant underbrush if you agree that H&P V's assets were not taken in violation of international law. That leaves the shareholder claim, which is that the beneficial or the ownership, the economically productive use of the shares was extinguished. Now here, what Ms. Carroll seems to be arguing today, in addition to the bits in the treaties and the kind of agglomeration concept in the footnotes in their brief, is that there is a difference not just in degree but in kind from Barcelona Traction and Diallo. But Barcelona Traction specifically said, even where a company is, quote, empty of all economic content, that's page 48 of Barcelona Traction, there still is not an impingement on the right of the shareholder to bring a claim on behalf of the company. So to the extent that there is some sliding scale that is thought to be applied here, first of all, I don't think that's ever been suggested before, but second, Barcelona Traction stands for that rock-bottom idea that even when a company has been emptied of all content, the parent is not in a position to press claims for its loss of the economic productive use of that company. That leaves Ramirez. So she was saying that's separate from loss of the value of the shares, which is a direct claim that just wasn't raised in that case. Yes, but that's where then the Diallo case comes in, that I mentioned in response to one of Judge Cable's questions earlier. Diallo applied that same principle in the context of a claim for indirect expropriation. I believe Judge Garland, one of the paragraphs that you read to Ms. Carroll, describes it as exactly that. So the same principles held in Barcelona Traction were applied in Diallo to exactly this type of contention. But in Diallo, there were cross-signs of the fact that the parent had not lost his effective control over the company. The parent had not lost – well, I want to make sure that we're not sort of merging the two streams again, Judge Cable. The loss of ownership and control in H&PV's assets is that first category of direct claims. And those – No, I thought – again, maybe I need some more untangling help here – but I thought that that was different from the Barcelona Traction claim, that there are direct rights in the control of the corporation that are different from the ownership of the assets. No, I think the way that IDC, at least, has characterized it, which I think is correct under corporate and international law, is that they describe one set of direct rights as being their right to ownership and control in H&PV's assets. The second was the right to the economically productive use of the shares. Why are they invoking the commercial code then? Sorry? Why are they invoking the commercial code? I think they're invoking the commercial code because under their theory, remember, H&PV also has an expropriation claim. So the reason that they need to invoke the commercial code and Decree 356 and Decree 1867 is because if we're wrong that H&PV's expropriation claim fails, then we and you have to go on to determine whether there are separate direct rights in H&PV's property because under their estimation, the property was taken in violation of international law. That's the circumstance that would trigger you having to make an inquiry into Article 280 and Decree 356 and all the various articles therein. It is only if you conclude that H&PV has a claim that you have to get into all of that. The most efficient path through, I would suggest, Judge Tatel, is to start with the H&PV question, determine that there is no taking in violation of international law. That resolves the first of the two categories of IDC's claims because all of those claims to direct rights in H&PV's assets don't matter. So that leaves the shareholder standing. We've talked about it to a couple extents. I want to make maybe one point on Ramirez, which is the fact that Ramirez is the first and only case that H&P can cite tells you something. And I would direct you to Judge Scalia's dissent in Ramirez at pages 1556 to 57, where he explains why that decision really is fundamentally wrong, I think is the way that he puts it, and has never again been cited. The last thing I would say with respect to Ms. Carroll's comment about the only real recourse being here is that the recourse was for H&PV to incorporate somewhere other than Venezuela, as many other companies doing business in Venezuela have. That is the impediment that H&PV, and by extension its parent, has to pursuing a claim here. What if a country requires you to incorporate in that country in order to operate? There was no such requirement here. And I think if a company was required to incorporate in that country, that might trigger some instances of diplomatic protection, some outreach from the sovereign in which the company's primary shareholder is based. But I don't think it changes the general international law rule that a taking of a state's own property or the property of its own national is not an instance for international law concern. Are there no further questions? Thanks both sides for a very excellent argument. We really appreciate it. We take the matter under suspicion.
judges: Garland, Tatel, Sentelle